Michael P. Lehmann
(State Bar No. 77152)
**HAUSFELD LLP**
580 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 633-1908
mlehmann@hausfeld.com

Michael L. Roberts (*pro hac vice forthcoming*)
Erich P. Schork (*pro hac vice forthcoming*)
Christopher Sanchez (*pro hac vice forthcoming*)
Stephanie Egner Smith (*pro hac vice forthcoming*)
**ROBERTS LAW FIRM US, PC**
1920 McKinney Ave., Suite 700
Dallas, TX 75201
Telephone: (501) 821-5575
mikeroberts@robertslawfirm.us
erichschork@robertslawfirm.us
chrissanchez@robertslawfirm.us
stephaniesmith@robertslawfirm.us

*Counsel for Plaintiff and the Proposed Class*

*[Additional counsel listed below]*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KPH HEALTHCARE SERVICES, INC. A/K/A KINNEY DRUGS, INC., individually and on behalf of all others similarly situated, | Case No. 3:25-cv-2966 |
| Plaintiff, | |
| v. | **DIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN AND CLAYTON ACTS** |
| TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA PHARMACEUTICALS U.S.A., INC., TAKEDA PHARMACEUTICALS AMERICA, INC., TWI PHARMACEUTICALS INC., and TWI PHARMACEUTICALS USA, INC. | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    PARTIES ............................................................................................................ 4

III.   JURISDICTION AND VENUE ........................................................................ 5

IV.    DIVISIONAL ASSIGNMENT ......................................................................... 6

V.     BACKGROUND ................................................................................................ 6

       A.   New Drug Applications and the Listing of Pharmaceutical Patents in the FDA's Orange Book ................................................................................................................. 6

       B.   The Limits of Patent Protection for Drugs .................................................... 8

       C.   Congress Deliberately Eased the Approval Process for Generic Manufacturers ........ 9

            1.   The Paragraph IV Certification Process .............................................. 10

            2.   The 180-day Exclusivity Period for the First-Filer Generic ............................. 11

       D.   The Competitive Effects of AB-Rated Generic Competition ..................................... 13

            1.   Later Generics Drive Prices Down Further .......................................... 14

            2.   AGs Compete on Price, Like Other Generics ......................................... 14

VI.    ABUSE OF THE REGULATORY STRUCTURE BY DRUG COMPANIES ........... 15

       A.   Reverse Payments Are a Means to Delay Competition ............................... 16

            1.   A Brand Manufacturer's Payment of Cash to a Generic Manufacturer to Stay Out of the Market Is One Clear Example of a Reverse Payment ..................................... 17

            2.   "No-Authorized Generic" Agreements Are Another Form of a Reverse Payment that Allow Brand and Generic Manufacturers to Share the Gains from Conspiring .. 17

VII.   ALTERNATIVE *PER SE* THEORY OF ANTITRUST LIABILITY ...................... 20

VIII.  FACTS OF THIS CASE .................................................................................. 21

       A.   Takeda's Development and Sale of Dexilant ............................................... 21

       B.   Takeda's Patents, Orange Book Listings, and ANDA Filings by Generic Manufacturers .................................................................................................................. 21

C.    Takeda's Infringement Suits Against Generic Manufacturers and 2013 Trial Rulings.. ........................................................................................................................ 24

D.    Takeda Resolves Each of Its Dexilant Patent Cases After the Initial Trial ............... 26

E.    Takeda's Settlement with TWi Included an Unlawful "Reverse Payment" Agreement, Whereby TWi Delayed Its Market Entry in Exchange for Significant and Unjustified Compensation from Takeda ............................................................................................ 27

F.    Takeda Entered Into Other Alleged Improper Agreements with Competitors During this Same Time Period ........................................................................................................ 31

G.    If Takeda Retained the Right to Launch an AG or Received Royalties from TWi, such Facts Would Not Change the Illegality of Defendants' Agreement ................................... 32

H.    In the Absence of Defendants' Agreement, Two Generics Would Have Been Available, at a Much Lower Price Point, by Approximately June 15, 2020 or Earlier......................... 33

IX.    CLASS ALLEGATIONS ........................................................................................ 34

X.    MARKET POWER AND RELEVANT MARKET........................................................ 37

XI.    MARKET EFFECTS AND DAMAGES TO THE CLASS .......................................... 39

XII.    ANTITRUST IMPACT AND EFFECT ON INTERSTATE COMMERCE .............. 40

XIII.    CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT ................. 41

XIV.    CLAIMS FOR RELIEF ........................................................................................ 42

XV.    DEMAND FOR JUDGMENT .................................................................................... 46

XVI.    JURY DEMAND .......................................................................................................... 47

Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. ("Plaintiff") brings this lawsuit, on behalf of itself and all others similarly situated, against Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., Takeda Pharmaceuticals America, Inc. (collectively, "Takeda") and TWi Pharmaceuticals, Inc. and TWi Pharmaceuticals USA, Inc. ("TWi") (together "Defendants"). The allegations contained herein are based on personal knowledge as to Plaintiff and upon information and belief as to all other topics.

## I.    INTRODUCTION

1.    This lawsuit challenges a horizontal conspiracy and agreement among the Defendants to restrain competition in the market for the pharmaceutical product Dexilant (active ingredient: dexlansoprazole) and its generic equivalents ("Agreement" or "Defendants' Agreement").

2.    Defendants, which are competing pharmaceutical manufacturers, entered into a "reverse payment agreement," whereby a patent holder pays an alleged or potential infringer to stay off the market, to not challenge its patents, or to otherwise not compete with the patent holder in the market for the patented product. In a typical competitive market, the infringer pays damages and/or royalties to the patent holder. But in the "reverse payment" scenario, as alleged herein, the payment flows in the opposite direction. That is, the patent holder pays the alleged infringer to stay out of the market—an agreement in restraint of trade for the patented product.

3.    The subject of Defendants' Agreement, the drug Dexilant, is a treatment for erosive esophagitis and symptoms of gastroesophageal reflux disease, also known as GERD.

4.    Since 2009, Takeda has sold branded Dexilant in the United States and generated billions of dollars in revenue from such sales.

5.    Beginning in 2010, generic pharmaceutical manufacturers began filing applications with the United States Food and Drug Administration ("FDA") seeking approval to market and sell generic versions of Dexilant to compete with Takeda's branded product.

6.    Takeda sued to stop this competition, claiming that these generic manufacturers would infringe one or more of Takeda's patents for the drug.

CLASS ACTION COMPLAINT

CASE NO. 3:25-cv-2966

7.    Three of Takeda's lawsuits—against generic manufacturers TWi, Par and Impax—were consolidated and proceeded to trial in 2013.

8.    The trial court judge—the Honorable Joseph Spero of this district—ruled in favor of the generic manufacturers with respect to certain patents and in favor of Takeda with respect to others.

9.    With respect to TWi, it was found to have infringed a single patent—United States Patent No. 7,737,282 ("the '282 patent")—which had an expiration date of June 15, 2020. Par and Impax were found to infringe other patents, with later expiration dates.

10.    TWi had strong arguments for affirming its trial wins and reversing its sole loss on the '282 patent at the Court of Appeals for the Federal Circuit. As explained below, one of the judges on the Federal Circuit panel, expressed the view during oral argument held in March of 2015 that Judge Spero had committed reversible error by finding that the '282 patent was not invalid because it was anticipated or rendered obvious in the prior art. Even assuming the trial court rulings were all affirmed, TWi was still on a path to enter the market in June of 2020, when the '282 patent was set to expire, and which would have been before Par and Impax, which had the additional patent obstacles from the trial rulings.

11.    On April 27, 2015, a few weeks after oral argument before the Federal Circuit, but before the appeals were decided, Takeda settled its claims against the generic manufacturers, including all claims against TWi.

12.     Rather than compete, Takeda and TWi decided to enter into a reverse payment settlement to unlawfully prolong Takeda's monopoly.

13.    Specifically, on or around April 27, 2015, Takeda and TWi reached an anticompetitive agreement pursuant to which TWi agreed to delay launching a generic version of Takeda's Dexilant product until January of 2022, approximately 18 months *after* the expiration date of the single patent blocking TWi from the market. As compensation to TWi to forgo competing with branded Dexilant, Takeda paid off TWi in at least two ways.

14.    *First*, Takeda paid TWi $9.5 million in cash.

15.    *Second*, Takeda gave TWi the option to launch either an authorized generic ("AG") version of Dexilant or its own Abbreviated New Drug Application ("ANDA") product, knowing that TWi would choose the former because doing so would ensure that only one generic version of the drug came to market rather than two. In effect, Takeda granted TWi a monopoly on generic sales of the drug and agreed not to compete with TWi when TWi was finally permitted to enter the market in 2022.

16.    Complying with that unlawful agreement, TWi waited until on or around January 1, 2022, to begin selling the AG Dexilant product, and Takeda, as agreed, allowed TWi to be the sole generic on the market for nearly a year.

17.    The deal was a win-win for Defendants. Takeda benefited by prolonging its monopoly until 2022, which allowed it to avoid generic competition and charge supracompetitive prices for branded Dexilant during that time. TWi benefited because, when it did eventually enter the market, it was able to sell generic Dexilant without competition from other generics for nearly a year.

18.    Conversely, the agreement was a lose-lose for Plaintiff and other direct purchasers of branded and generic Dexilant, who were: (a) overcharged because they were forced to buy branded Dexilant when a cheaper generic product would have otherwise been available by mid-2020; and (b) overcharged on their generic Dexilant purchases after TWi's AG Dexilant finally entered the market in January 2022, because TWi was able to charge more for generic Dexilant than it otherwise would have been able to charge had TWi not been the exclusive seller of generic Dexilant for nearly a year.

19.    The foregoing scheme was part of a broader effort by Takeda during this time period to unlawfully thwart generic competition against its branded products. For example, approximately seven months before Defendants' Agreement here, Takeda entered an agreement with Par concerning a different Takeda drug called Amitiza. The Amitiza agreement is alleged to contain similar pay for delay terms that have been challenged in a separate ongoing lawsuit, and the court there has ruled that the agreement's terms plausibly establish a claim for an antitrust

violation. In addition, within a year of Defendants' Agreement here, Takeda was at it again, this time allegedly orchestrating agreements with multiple generic manufacturers to inhibit competition with its branded drug Colcrys. The Colcrys agreements also resulted in antitrust litigation, which, after Takeda's motions to dismiss and summary judgment were denied in part, Takeda settled during trial.

20.     This lawsuit seeks to hold Takeda and TWi accountable for their unlawful conduct, which prevented free and fair competition and caused significant financial harm to direct purchasers of Dexilant and its generic equivalents, including Plaintiff and all others within the putative class.

## II.  PARTIES

21.     Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. is a corporation organized under the laws of the state of New York, with its principal place of business located at Gouverneur, New York. KPH directly purchased generic Dexilant from the Defendant TWi during the class period. KPH directly purchased generic Dexilant from the Defendant TWi during the class period. KPH also brings this action as an assignee of McKesson Corporation ("McKesson") duing the class period, McKesson purchased Dexilant and generic Dexilant directly from Defendants for resale to KPH and has expressly assigned its claims arising out of those purchases to KPH. KPH has suffered antitrust injury because of the anticompetitive conduct alleged herein.

22.     Defendant Takeda Pharmaceutical Company Limited ("Takeda Japan") is a Japanese corporation having its global headquarters and a principal place of business at 1-1, Nihonbashi-Honcho 2-Chome, Chuo-ku, Tokyo 103-8668, Japan. Takeda Japan owns and controls Takeda Pharmaceuticals U.S.A., Inc., ("Takeda U.S.A.") and Takeda Pharmaceuticals America, Inc. ("Takeda America"). Takeda Japan, Takeda U.S.A. and Takeda America were all parties to the unlawful settlement agreement with TWi.

23.     Takeda U.S.A. and Takeda America's current principal place of business is at 95 Hayden Avenue, Lexington, Massachusetts 02421. Takeda also has United States operations near Chicago, Illinois, and in San Diego, California.

24.     Defendant TWi Pharmaceuticals, Inc. ("TWi Pharmaceuticals") is a Taiwanese corporation having a principal place of business at 3F., No. 41, Ln. 221, Gangqian Rd., Neihu Dist., Taipei City 114, Taiwan (R.O.C.). TWi Pharmaceuticals owns and controls TWi Pharmaceuticals USA, Inc. ("TWi USA") with a principal place of business at 115 West Century Road, Suite 135, Paramus, NJ 07652.

25.     All of the Defendants' wrongful actions described in this complaint are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

### III. JURISDICTION AND VENUE

26.     This action arises under sections 1 through 3 of the Sherman Act (15 U.S.C. §§ 1, 2, and 3), and sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26) and Plaintiff seeks to recover threefold damages, costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the class (defined below) resulting from Defendants' conspiracy to restrain trade and monopolization of the dexlansoprazole market. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a) and 15 U.S.C. §§ 15 and 26.

27.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and/or 28 U.S.C. §§ 1391(b), because during the class period, the Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce discussed below has been carried out in this District.

28.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

29.     During the relevant period, Takeda and TWi manufactured, sold and shipped Dexilant and/or generic Dexilant capsules in a continuous and uninterrupted flow of interstate

commerce. The conspiracy in which Defendants participated, and Takeda's monopolization of the dexlansoprazole market, had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

30.     During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy or to monopolize the dexlansoprazole market. This Court has personal jurisdiction over each Defendant, because each Defendant—throughout the United States and including in this District—has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme and conspiracy. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.  DIVISIONAL ASSIGNMENT

31.     Pursuant to Northern District of California Local Rules 3-1(d) and 3-5(b), this action is filed in the San Francisco Division of the Northern District of California, where the underlying patent litigation described herein took place, where Defendants transact significant business, and where a related case--*Walgreen Co., et al. v. Takeda Pharmaceutical Co., Ltd., et al.*, No. 3:25-cv-02795 JSC (N.D. Cal.)--is pending.

## V.  BACKGROUND

### A. New Drug Applications and the Listing of Pharmaceutical Patents in the FDA's Orange Book

32.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"),[1] brand drug manufacturers that wish to sell a new drug product must obtain FDA approval by filing a New Drug Application ("NDA"). An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information about patents.[2]

---

[1] 21 U.S.C. § 301 *et seq.*

[2] 21 U.S.C. § 355(a), (b).

33.    The FDA approves new drugs based on their ability to satisfy the minimum regulatory requirements—namely, show that they are safe and effective to treat a particular indication. New drug applicants are not required to, and usually do not try to, show that their new drug product is better than other similar, already approved, products.

34.    When the FDA approves a brand manufacturer's NDA, the manufacturer may direct the FDA to list certain kinds of patents in the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book")—*i.e.*, patents that: (a) claim the drug substance, drug product, or method of using the drug in the approved indication,[3] and (2) can "reasonably be asserted" against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents. When a manufacturer obtains a new listable patent after the FDA has approved an NDA, it may direct FDA to list that patent in the Orange Book within 30 days of issuance.[4]

35.    The FDA relies completely on the brand manufacturer's truthfulness in submitting patents to be listed, as it does not have the resources or authority to verify the validity or relevance of the manufacturer's patents.  In listing patents in the Orange Book, the FDA merely performs a ministerial act.

36.    As described further below, when a patent is (properly) listed in the Orange Book, a brand manufacturer may sue a generic company for infringing that patent before the generic product is sold. If it does, the FDA cannot approve the generic manufacturer's drug application for two-and-a-half years.[5]

37.    Here, it was undisputed that the '282 patent was never listed in the Orange Book and TWi raised that as one of the issues on its appeal to the Court of Appeals for the Federal Circuit.

---

[3] 21 U.S.C. § 355(b)(1)(A)(viii).

[4] 21 U.S.C. § 355(b)(1), (c)(2).

[5] 21 U.S.C. §§ 355(c)(3)(C), (j)(5)(B)(iii).

**B. The Limits of Patent Protection for Drugs**

38.     The existence of one or more patents purporting to claim a drug substance or drug product does not by itself give a brand drug company an enforceable monopoly over the drug. Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the United States Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.

39.     As discussed in greater detail below, under the framework set forth in the Hatch-Waxman Amendments, enacted in 1984, a generic drug company can challenge patents ostensibly covering the branded drug. A patent infringement lawsuit by the patent holder within 45 days after notification of the generic drug company's challenge of the patents will trigger a 30-month stay of regulatory approval, during which the FDA cannot approve the generic drug.[6]

40.     At all times, a patent holder bears the burden of proving infringement.

41.     One way that a generic can prevail in patent infringement litigation is to show that the patent holder cannot meet its burden to prove infringement. Another is to show that the patent is invalid or unenforceable.

42.     A patent is invalid or unenforceable when, *e.g.*, (a) the disclosed invention is anticipated or obvious in light of earlier prior art, sale or use;[7] (b) an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (c) a later-acquired patent is

---

[6] 21 U.S.C. § 355(j)(5)(B)(iii).

[7] Other actions by the patentee, but less relevant here, can invalidate or otherwise render a patent unenforceable. While not an exhaustive list, such actions include failure to name the correct inventors, failure to adequately describe and claim the invention, failure to pay required maintenance fees to the PTO. Licenses and ownership transfers can render a patent unenforceable against a particular infringer, and laches and estoppel can apply when a patent holder delays too long to bring suit against a known infringer. Lastly, the patent can be unenforceable because its term has expired.

CLASS ACTION COMPLAINT                                              CASE NO. 3:25-cv-2966

not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).

43.     In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of: (a) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, (b) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit, or (c) whether a patent may be "reasonably asserted" against a competitor or otherwise properly listed in the Orange Book.

44.     As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The Federal Trade Commission ("FTC") reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[8] An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[9]

45.     If a generic manufacturer successfully defends against the brand's infringement lawsuit—either by showing that its proposed generic product does not infringe any asserted patents and/or that any asserted patents are invalid or unenforceable—the generic may enter the market immediately upon receiving approval from the FDA.

### C. Congress Deliberately Eased the Approval Process for Generic Manufacturers

46.     A drug company that wants to sell a generic drug must file an ANDA with the FDA.

_____

[8] FTC, Generic Drug Entry Prior to Patent Expiration: An FTC Study vi-vii (2002), available at https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf (last accessed Feb. 11, 2025).

[9] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 TEX. L. REV. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.), available at http://texaslawreview.org/wp-content/uploads/2015/08/AllisonEtAl-92-7.pdf (last accessed Feb. 11, 2025).

47.    To expedite the availability of affordable generic drugs, Congress determined that generic drug manufacturers do not have to establish the safety and efficacy of the generic versions of brand drugs, because the safety and efficacy of the brand drugs were established by the brand manufacturer at the NDA approval stage. Through the Hatch-Waxman Amendments, Congress reduced the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.

48.    Instead, an ANDA applicant must show that the drug product described in the ANDA is bioequivalent to or "the same as" the brand drug.[10] That is, that the generic product contains the same active ingredient, conditions of use, route of administration, dosage form, strength, rate and extent of absorption (bioequivalence), and—with certain permissible differences—labeling as the reference listed drug.

49.    Having done so, the ANDA applicant may rely on the FDA's previous finding that the brand drug product is safe and effective because—as a matter of good science and decades of experience—there is no reason to believe that the generic product would behave differently in the body than the brand product. If a generic application meets those criteria relative to its brand counterpart, the FDA assigns the generic drug an "AB" rating.

50.    The FDA has considerable flexibility in determining how the bioequivalence requirements are satisfied.

**1.    The Paragraph IV Certification Process**

51.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must, unless a claimed method of use will not be used by the manufacturer, contain one of four certifications: (a) that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification"); (b) that the patent for the brand drug has expired (a "Paragraph II certification"); (c) that the patent for the brand drug will expire on a

---

[10] *See* 21 U.S.C. § 355(j)(2)(A).

particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or (d) that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii).

52.     If a generic manufacturer files a Paragraph IV certification, it must notify the brand manufacturer and provide the brand manufacturer with detailed information that the proposed generic does not infringe the listed patents or that the patents are invalid.[11] The brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification, the FDA will not grant final approval of the ANDA until the earlier of: (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.[12]

53.     Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product (*i.e.*, grant final approval). The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay blocking final approval.

**2.  The 180-day Exclusivity Period for the First-Filer Generic**

54.     Generics may be classified in several different ways. They can be classified as: (a) first-filer generics, (b) later generic filers, and (c) the brand's own authorized generic or AG.

55.     To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the first generic manufacturer who files an ANDA with a Paragraph IV certification (the "first-filer") a 180-day period to market the generic version of the

---

[11] 21 U.S.C. § (j)(2)(A)(iv)(III).

[12] 21 U.S.C. § 355(j)(5)(B)(iii).

drug, during which time the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug.

56.    When a first-filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand product are either invalid or not infringed by the generic's product, the FDA cannot approve a later generic company's ANDA until that first-filing generic has been on the market for 180 days or the first-filer exclusivity has been forfeited. The 180-day window is referred to as the first-filer's six month or 180-day "exclusivity" period.

57.    This description is somewhat of a misnomer, because a brand drug manufacturer (such as Takeda) can launch what is called an authorized generic or unbranded version of its own brand drug, under its own NDA, at any time.  Brand companies frequently do so in response to actual or anticipated generic entry in order to recoup some of the sales they would otherwise lose.

58.    To be eligible for the 180-day first-filer exclusivity, an ANDA applicant must: (a) file the first substantially complete ANDA, (b) challenge the brand's patent(s), and (c) obtain tentative approval within 30 months (two and a half years) of filing.

59.    The FDA grants "tentative approval" to an ANDA that meets the conditions of approval and is ineligible for final approval because of an unexpired exclusivity or stay.

60.    If a first-filer does not obtain tentative approval within 30 months of filing its ANDA (with one exception), it forfeits its 180-day exclusivity.[13]

61.    A first-filer can also forfeit exclusivity as to any later filers when: (a) a later filer receives a final judgment that their proposed ANDA product either does not infringe the patents certified against by the first filer or that such patents are invalid; and (b) the first filer fails to market before 75 days have passed since such judgment from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken.[14]

---

[13] 21 U.S.C. § 355(j)(5)(D)(i)(IV).

[14] 21 U.S.C. 355(j)(5)(D)(i)(I)(bb)(AA).

**D. The Competitive Effects of AB-Rated Generic Competition**

62. Generic versions of brand drugs contain the same active ingredient and are determined by the FDA to be just as safe and effective as their brand counterparts. The only material difference between generic drugs and their corresponding brand versions is their price.

63. Experience and economic research show that the first generic manufacturer to launch prices its product below the prices of its brand counterpart.[15] Every state either requires or permits that a prescription written for the brand drug be filled with an AB-rated generic. Thus, the first generic manufacturer almost always captures a large share of sales from the brand version of the drug. At the same time, there is a reduction in average price paid for a prescription for the drug at issue (brand and AB-rated generic combined).

64. If there is no AG on the market during the 180-day exclusivity period—or any other period where there is just one generic available—then such generic is priced below the brand product, but not as low as it would if it were facing competition from other generics.

65. Since in these circumstances, the generic competes only with the brand product, and because the brand company rarely drops the brand product price to match the generic, the exclusive generic does not face the kind of price competition it will when additional generic products, including an AG, are available. Thus, a first-filer or other exclusive generic earns much greater sales and profits without an AG being marketed alongside it during any period of exclusivity.

---

[15] FTC, AUTHORIZED GENERIC DRUGS: SHORT-TERM EFFECTS AND LONG-TERM IMPACT, at ii-iii, vi, 34 (Aug. 2011) ("FTC 2011 AG Study"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf (last accessed Feb. 11, 2025); FTC Staff Study "Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions", at 1, available at https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf (last accessed Feb. 11, 2025).

CLASS ACTION COMPLAINT                                                CASE NO. 3:25-cv-2966

## 1. Later Generics Drive Prices Down Further

66.     Once multiple generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.

67.     Soon after generic competition begins, the vast majority of the sales formerly enjoyed by the brand shift to generic sellers. In a report by the FTC issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months.[16] In the end, total payments to the brand manufacturer of the drug decline to a small fraction of the amounts paid prior to generic entry.

68.     FDA reports that generic drugs saved the United States healthcare system nearly $2.2 trillion from 2009 to 2019; and the Office of Generic drugs reported in 2022 that the savings to consumers and the healthcare system during the first year after approval for new generic drugs approved in 2018, 2019, and 2020 to be approximately $53.3 billion.[17]

## 2. AGs Compete on Price, Like Other Generics

69.     As described above, nothing prevents a brand manufacturer from selling an AG at any time. An AG is chemically identical to the brand drug but is sold as a generic product typically through either the brand manufacturer's subsidiary (if it has one) or through a third-party distributor. An AG is essentially the brand drug but in a different package, without the brand name. One study notes that "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[18] Brand manufacturers sometimes begin selling AGs before the first generic launches in order to secure multi-year

---

[16] FTC 2011 AG Study, at 66-67.

[17] Office of Generic Drugs 2022 Annual Report, available at https://www.fda.gov/drugs/generic-drugs/office-generic-drugs-2022-annual-report.

[18] K. A. Hassett & R. J. Shapiro, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals*, SONECON, p. 3 (May 2007) available at https://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf (last accessed Feb. 11, 2025).

purchase contracts with direct purchasers and load the generic pipeline at the expense of the first-filer or other exclusive generic.

70.     Competition from an AG substantially reduces drug prices and the revenues of the first generic (especially if the first generic has 180-day or some other form of exclusivity that prohibits or delays any other ANDA generic from entering the market).

71.     The FTC found that AGs capture a significant portion of sales, reducing the first-filer generic's revenues by approximately 50% on average.[19] A first generic makes much less money when it faces competition from an AG because (a) the AG takes a large share of unit sales and (b) the presence of the AG causes prices, particularly generic prices, to decrease.

## VI.  ABUSE OF THE REGULATORY STRUCTURE BY DRUG COMPANIES

72.     Brand manufacturers and generic manufacturers are typically marketplace competitors.

73.     Unfortunately for direct purchasers like Plaintiff, it is relatively common for brand and generic manufacturers of pharmaceuticals to conspire in order to maintain high prices, protect their profits, and split between themselves the enormous savings that increased generic competition would have delivered to drug purchasers.

74.     For such an anticompetitive pact to work, brand and generic manufacturers need a means by which to divide between them the ill-gotten gains—the increased profit to the detriment of drug purchasers—that delayed competition makes possible. The means usually takes the form of payoffs from the brand manufacturer, deals that are often referred to as "pay-for-delay," "exclusion payment," or "reverse payment" agreements.

75.     While the form of the "reverse payments" from the brand to the generic can vary, such as direct monetary compensation or granting periods of exclusivity, the goal is the same: to entice the generic manufacturer not to compete.

---

[19] FTC 2011 AG Study, at 139.

76.     ANDA filers who enter, or expect to enter, after the initial entry by the conspiring generic manufacturer have more modest financial expectations because they may have little or no expectation of any form of market exclusivity. By the time they enter the market, there is at least the brand and one other generic on the market (and often a second generic in the form of an AG) and, thus, the drug has already been, or is on its way to being, commoditized.

77.     Thus, such later entering generics often decide to simply give in to or join the conspiracy between the brand manufacturer and the generic with exclusivity rights, agree to drop their challenges to the brand manufacturer's patent(s), and stay off the market until well after entry by the initial generic. This behavior furthers the harm to drug purchasers.

78.     These pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

**A. Reverse Payments Are a Means to Delay Competition**

79.     In a typical reverse payment agreement, the brand manufacturer pays a generic manufacturer to: (a) delay or abandon market entry, and (b) abandon the invalidity and unenforceability challenges to the brand manufacturer's patents. The brand manufacturer preserves its monopoly by paying some of its monopoly profits to the generic manufacturer, and the generic manufacturer agrees to delay marketing its product, allowing the brand manufacturer to have an extended monopoly period.

80.     The size of the payment is usually a proxy for assessing the patent merits. As the Supreme Court observed in *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 157–58 (2013), "[t]he owner of a particularly valuable patent might contend, of course, that even a small risk of invalidity justifies a large payment. But, be that as it may, the payment (if otherwise unexplained) likely seeks to prevent the risk of competition." In other words, the Court went on, "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness . . . ."

**1.  A Brand Manufacturer's Payment of Cash to a Generic Manufacturer to Stay Out of the Market Is One Clear Example of a Reverse Payment**

81.    One clear example of a reverse payment occurs when a patentee pays an alleged infringer in cash to end a lawsuit.

82.    As a result of regulatory scrutiny, congressional investigations, and class-action lawsuits, reverse payments in cash are now relatively uncommon.

83.    However, they do still happen, as demonstrated by Takeda's monetary payment to TWi in this case in exchange for TWi's delayed launch of a generic Dexilant.

**2.  "No-Authorized Generic" Agreements Are Another Form of a Reverse Payment that Allow Brand and Generic Manufacturers to Share the Gains from Conspiring**

84.    Another example, also at issue here, is when a brand manufacturer agrees not to market an AG version of the brand drug—or structures the settlement so that it would make no economic sense for the brand to launch an AG (*i.e.*, a *de facto* no-AG agreement)—for some period of time after the first generic enters the market, in exchange for the first generic agreeing to a delayed entry date.

85.    The promise of payment to a first-filer or other exclusive generic in the form of an agreement not to launch an AG is economically equivalent to the promise of a cash payment by the brand manufacturer to the generic. By refraining from launching an AG under the agreement, the brand manufacturer forgoes the sales and revenues it otherwise would have made with its AG, which significantly and predictably increases the revenues and profits of the generic company who can sell its product without other generic competition.

86.    There is no statutory prohibition on a brand manufacturer launching an AG when it desires, including during any period of exclusivity for the first generic.

87.    Absent a no-AG promise, it almost always makes economic sense for the brand manufacturer to begin marketing an AG as soon as (or sometimes weeks or months before) the first generic enters the marketplace.

88.    With respect to a first-filer or other exclusive generic, competition from an AG has a drastically negative effect on its revenues. As discussed previously, an AG typically takes a

1    substantial volume of the unit sales and drives prices lower—delivering commensurate savings to

2    drug purchasers.

3         89.    In light of this economic reality, a first-filer or other generic may be willing to delay

4    its entry into the marketplace in return for the brand manufacturer's agreement to forgo competing

5    with an AG during an exclusivity period.

6         90.    The additional monopoly profits the brand manufacturer gains from the delayed

7    onset of generic competition more than make up for the profits it forgoes by temporarily not

8    competing with its AG. The brand manufacturer gains from the delayed onset of generic

9    competition; a first-filer or other generic with exclusivity gains from the absence of generic

10    competition for a period of time after it launches.

11         91.    Conversely, drug purchasers, like Plaintiff here, lose. The brand and generic

12    manufacturers' reciprocal pledges not to compete harm purchasers in multiple ways. *First*, the pact

13    delays generic entry into the marketplace, thereby extending the time during which the more

14    expensive brand is the only product on the market. *Second*, the pact prevents or is structured to

15    disincentivize the brand from marketing an AG during any 180-day or other exclusivity period (or

16    beyond), reducing price competition amongst generic versions of the drug during that period,

17    particularly competition that would otherwise occur between the generic and the brand's AG.

18         92.    For a first-filer or other generic with exclusivity, the difference between selling the

19    only generic and competing against an AG can amount to tens or even hundreds of millions of

20    dollars, depending on the size of the brand's sales. A no-AG pledge thus has the same economic

21    effect as a payoff made in cash, with even greater anticompetitive consequences as it removes a

22    competitor. As explained by the then-Chairman of the FTC:

23            Because the impact of an authorized generic on first-filer revenue is
24            so sizable, the ability to promise not to launch an AG is a huge
        bargaining chip the brand company can use in settlement
25            negotiations with a first-filer generic. It used to be that a brand might
        say to a generic, "if you go away for several years, I'll give you $200
26            million." Now, the brand might say to the generic, "if I launch an

27

AG, you will be penalized $200 million, so why don't you go away for a few years and I won't launch an AG."[20]

93.    Courts agree that no-authorized generic agreements are a form of payment actionable under *Actavis* and anticompetitive.[21]

94.    When a brand manufacturer agrees to a no-AG clause in exchange for delaying generic entry, the additional profits gained delaying generic competition to significantly outweigh any profit that could have been gained from selling an AG. The bottom line is that the brand manufacturer gains a longer period of monopoly profits by delaying the onset of generic competition, and the generic maintains higher generic sales and pricing during its exclusivity period. Thus, no-AG agreements allow competitors to benefit from an agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition.

95.    No-AG agreements need not be explicit to achieve their anticompetitive ends. According to the FTC, another "common" form of "possible compensation" to the settling generic is an agreement containing "a declining royalty structure, in which the generic's obligation to pay royalties is reduced or eliminated if a brand launches an authorized generic product."[22] As the FTC

---

[20] "Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics," FTC (June 24, 2009), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authgenstatementleibowitz.pdf (last accessed February 11, 2025).

[21] *See In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 549-50 (1st Cir. 2016); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 719–20 (N.D. Ill. 2016); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 242 (D. Conn. 2015); *United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069-71 (N.D. Cal. 2014); *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 WL 4988410, at *20-21 (D.N.J. Oct. 6, 2014); *Time Ins. Co. v. AstraZeneca AB*, 52 F. Supp. 3d 705, 709–10 (E.D. Pa. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751 (E.D. Pa. 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 392 (D. Mass. 2013).

[22] FTC, Bureau of Competition, Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003: Overview of Agreements Filed in FY 2017 (2018), at 2, *available at* https://www.ftc.gov/system/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-modernization/mma_report_fy2017.pdf (last accessed Feb. 11, 2025).

CLASS ACTION COMPLAINT                                        CASE NO. 3:25-cv-2966

has stated, "[t]his type of provision may achieve the same effect as an explicit no-AG commitment."[23]

96.    And as courts have observed, an "explicit reservation . . . does not on its own preclude the existence of an implicit no-AG agreement."[24]

## VII. ALTERNATIVE *PER SE* THEORY OF ANTITRUST LIABILITY

97.    Independent of a reverse payment theory, here the '282 Patent expired on June 15, 2020, but under its Agreement with Takeda, TWi did not produce a generic equivalent to Dexilant until 18 months later, at the beginning of 2022.[25]

98.    This aspect of the Agreement constitutes horizontal collusion between a company and its potential competitor to allocate markets in violation of Section 1 of the Sherman Act. Such conduct has long been treated as a *per se* violation of the antitrust laws. As the United States Court of appeals for the Fifth Circuit has said, "[i]ndeed, paying a potential competitor not to compete is so detrimental to competition that normally it is a *per se* violation of the antitrust laws. *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 48–49 (1990)." *Impax Labs., Inc. v. FTC,* 994 F.3d 484, 493 (5th Cir. 2021).[26]

---

[23] *Id.*

[24] *Picone v. Shire*, No. 16-cv-12396, 2017 WL 4873506, at *9 (D. Mass. Oct. 20, 2017).

[25] *See In re HIV Antitrust Litig.*, 656 F..Supp. 3d 963, 1012 (N.D. Cal. 2023) ("More fundamentally, regardless of the strength or weakness of a patent, if a patentee could give a generic manufacturer an incentive to delay entry even by means other than a direct reverse payment, that could be a plausible basis for anticompetitive conduct.").

[26] *Accord, e,g.*, *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 908 (6th Cir. 2003) ("[I]t is one thing to take advantage of a monopoly that naturally arises from a patent, but another thing altogether to bolster the patent's effectiveness in inhibiting competition by paying the only potential competitor $40 million per year to stay out of the market."); *Snow v. Align Tech., Inc.*, 586 F. Supp. 3d 972, 978 (N.D. Cal. 2022) ("[a]s the Supreme Court has recognized, a market division agreement between potential competitors constitutes a horizontal restraint on trade"); *Fricke-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1180) (N.D. Cal. 2001) ("[n]o less so, section 1 makes allocations of product markets illegal, even when such allocations are unaccompanied by price fixing or other restraints. …. The proscription against market allocations or divisions extends to potential as well as actual competitors").

## VIII.   FACTS OF THIS CASE

### A.  Takeda's Development and Sale of Dexilant

99.     Defendant Takeda Pharmaceuticals U.S.A., Inc. is the registered holder of approved New Drug Application No. 22-287 for the manufacture and sale of the drug Dexilant (dexlansoprazole).

100.     Dexlansoprazole—marketed by Takeda under the trade name Dexilant—is a proton pump inhibitor ("PPI") used for the treatment of all grades of erosive esophagitis, maintaining healing of esophagitis, and treating heartburn associated with GERD.

101.     Dexlansoprazole works through the reduction in acid in one's stomach by blocking the final step of stomach acid production. It is released in two stages, based on different acidity levels in the human intestine.

102.     The FDA approved 30 mg and 60 mg dosage forms of Dexilant on January 30, 2009.

103.     Takeda originally marketed dexlansoprazole under the name Kapidex.

104.     In or around March 2010, Takeda began marketing Kapidex under the new name Dexilant to avoid potential confusion with two other medications.

105.     Dexilant generated significant revenue and profits for Takeda. Specifically, Dexilant sales grew from around $200 million annually in 2010 to over a billion dollars annually beginning in 2015 and nearly every year thereafter until generic dexlansoprazole came to the market in 2022.

### B.  Takeda's Patents, Orange Book Listings, and ANDA Filings by Generic Manufacturers

106.     Due to the large market for Dexilant, it was not long before other pharmaceutical manufacturers began taking steps to launch generic versions of the drug.

107.     The path to market entry by these potential generic competitors was impacted by Takeda's patents directed at Dexilant, many of which Takeda listed in the FDA's Orange Book.

108.    Takeda owns and over time has listed numerous patents in the Orange Book that it alleged covered Dexilant.

109.    Takeda also owns and has asserted claims for infringement on patent claims it alleges were infringed by generic Dexilant ANDA products, but which claims were not in a patent listed in the Orange Book.

110.    Takeda's asserted patents relating to Dexilant (including those listed in the Orange Book for NDA 22-287), along with their titles and expiration dates,[27] are as follows:

| U.S. Pat. No. | Title | Exp. Date | Listed in Orange Book |
|---|---|---|---|
| 7,737,282 ('282 patent") | Benzimidazole Compound Crystal | 6/15/20 | No |
| 6,462,058 ('058 patent") | A novel crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof of the present invention is useful for an excellent antiulcer agent. | 6/15/20 | Yes |
| 6,939,971 ('971patent") | Benzimidazole Compound Crystal | 6/15/20 | Yes |
| 7,285,668 ('668 patent") | Process for the Crystallization of (R)– or (S)-Lansoprazole | 6/15/20 | Yes |
| 9,145,389 ('389 patent") | Benzimidazole Compound Crystal | 6/15/20 | Yes |
| 6,664,276 ('276 patent") | Benzimidazole Compound Crystal | 1/30/23 | Yes |
| 8,722,084 ('084 patent") | Controlled Release Preparation | 10/15/23 | Yes |
| 8,784,885 ('885 patent") | Controlled Release Preparation | 10/15/23 | Yes |
| 8,461,187 ('187 patent") | Multi PPI Dosage Form | 1/17/26 | Yes |
| 9,238,029 ('029 patent") | Multi PPI Dosage Form | 1/17/26 | Yes |
| 9,011,926 ('926 patent") | Method for Producing Granules | 2/24/26 | Yes |

[27] Some of Takeda's patents received a patent extension for delays in regulatory approval and a pediatric exclusivity extension, which could add six months to their FDA term.  For example, the '276 Patent, originally set to expire on June 15, 2020, received a patent term extension of 959 days, and a six-month pediatric exclusivity extension, resetting the patent expiration to July 30, 2023.

| 7,790,755 ('755 patent") | Controlled Release Preparation | 8/02/26 | Yes |
|---|---|---|---|
| 8,105,626 ('626 patent") | Granules Containing Acid-Unstable Chemical In Large Amount | 9/27/26 | Yes |
| 8,871,273 ('273 patent") | Method for Producing Granules | 1/11/28 | Yes |
| 8,173,158 ('158 patent") | Methods of Treating Gastrointestinal Disorders Independent of the Intake of Food | 3/17/30 | Yes |
| 9,233,103 ('103 patent") | Methods for Treating Heartburn, Gastric Bleeding or Hemorrhage in Patients Receiving Clopidogrel Therapy | 3/05/32 | Yes |

111.    Due to Takeda's listing of patents in the Orange Book for Dexilant, when potential generic competitors filed ANDAs for their generic Dexilant product, they were required to certify against any patents that were listed at the time.

112.    The first pharmaceutical company to file an ANDA and certify against Takeda's then listed patents for the 60 mg generic dexlansoprazole product was Handa Pharmaceuticals, LLC ("Handa"). Handa's ANDA was filed on August 25, 2010, with a Paragraph IV certification to Takeda's then listed patents. Handa subsequently transferred its ANDA to Par Pharmaceutical Companies Inc. ("Par") in April 2012.

113.    The first pharmaceutical company to file an ANDA and certify against Takeda's then listed patents for the 30 mg generic dexlansoprazole product was Impax Laboratories, Inc. ("Impax").  Impax's ANDA was filed on November 30, 2010, with a Paragraph IV certification to Takeda's then listed patents.

114.    Generic manufacturer Anchen Pharmaceuticals, Inc. ("Anchen") filed ANDAs for 30 mg and 60 mg generic dexlansoprazole, which it transferred to Defendant TWi in May 2011. As with first filers Par and Impax, TWi filed Paragraph IV certifications to one or more of the Takeda patents then listed in the Orange Book.

115.    Other generic manufacturers similarly filed ANDAs for 30 and/or 60 mg dexlansoprazole in or around this same general time period that included Paragraph IV certifications.

**C. Takeda's Infringement Suits Against Generic Manufacturers and 2013 Trial Rulings**

116.     The ANDA filings for generic dexlansoprazole and their accompanying Paragraph IV certifications resulted in Takeda filing numerous patent infringement lawsuits against TWi, Par, Impax and others.

117.     The first (and only) trial of Takeda's various Dexilant lawsuits took place in June 2013 in the Northern District of California before Judge Spero.

118.     The trial consolidated Takeda's then pending actions and claims against TWi, Par and Impax. The issues in the trial were whether each ANDA infringed various claims of the '282, '755, '058, '276, '971 and '668 patents, the sufficiency of the disclosures in the patents, and whether the patents were anticipated or obvious in view of the prior art. The court's claim construction ruling narrowed some infringement claims and subsequently, at summary judgment, the court resolved additional infringement claims for each ANDA holder and certain validity questions on the asserted patents.

119.     As to TWi, Takeda conceded that TWi's ANDA did not infringe four patents: the '058, '276, '971 and '668 patents, and the court entered final judgment in TWi's favor with respect to those patents. At summary judgment, the court found that TWi's ANDA did not infringe the '755 Patent; however, the court granted Takeda's summary judgment motion that TWi's ANDA did infringe claims 1 and 2 of the '282 Patent. The court also denied TWi's motion on invalidity of the '282 Patent based on grounds of anticipation.

120.     As to Par, the court found at summary judgment that Par's ANDA did not infringe the '755 Patent; however, the court denied Par's summary judgment motion of non-infringement of the '276 Patent, finding triable issues of fact remained as to infringement of that patent; denied Par's motion on invalidity of the '282 Patent based on grounds of anticipation; and granted summary judgment to Takeda that the Par ANDA infringed the '282 Patent.

121.     As to Impax, the court found at summary judgment that Impax' ANDA did not infringe the '755 Patent; however, the court granted Takeda's summary judgment motion that '058, '276, and '971 Patents were infringed by the Impax' ANDA. The court rejected Impax' claims

24

that '971 Patent lacks adequate written description to support the asserted claims and denied Impax' cross motion of noninfringement of the '971 Patent. Thus, the following issues remained for trial: (a) infringement of the '276 patent against Par (Handa);  (b) validity of the '276,  '058 and '971 Patents as obvious in view of the prior art;  (c) validity of the '282 Patent in view of anticipation, obviousness, or lack of sufficient written description; (d) questions of standing of certain Takeda entities to assert infringement of the '282 Patent; and (e) whether Takeda could establish jurisdiction under the Declaratory Judgment Act ("DJA") against TWi for infringement of the '282 Patent under §271(a) of the Patent Act.

122.    Following a weeklong trial, on October 17, 2013, the district court issued Findings of Fact and Conclusions of Law, finding that: (a) Par's product infringed the '276 Patent; (b) the '276,  '058 and '971 Patents were not obvious in view of the prior art; (c) the '282 Patent was not anticipated or obvious in view of the prior art, and did not lack sufficient written description; (d) the Takeda entities had standing to assert the '282 Patent against TWi; and (e) Takeda could not assert the DJA against TWi for infringement of the '282 Patent under §271(a).

123.    At the trial, TWi had presented evidence that the '282 Patent was invalid based on anticipation in the prior art or obviousness:

> Takeda concedes that the '282 patent's asserted claims are anticipated by the prior art Larsson and Von Unge references, unless the claim term "amorphous" is construed as limited to *solid* compounds. There is no "clear indication in the intrinsic record" justifying limiting the term to just solids. *E.g., Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Takeda does not contest its own expert's testimony that the "plain and ordinary meaning" of amorphous includes nonsolids. (A1985; A1989.) Rather, Takeda admits that the extrinsic evidence shows that the term "amorphous" can be used to refer to liquids, but argues that it "typically" refers to solids. (Red Bf. 18–19.) That is not enough to limit the claims to solids, because claims are not limited only to what is "typically" used. *E.g., Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1374 (Fed. Cir. 2006).
>
> Even if limited to only solids, the asserted claims of the '282 patent are invalid in view of the prior art Barberich reference, either alone or in combination with the other prior art. Only Takeda's argument in the District Court that Barberich was not enabled stood in the way of a holding of invalidity. But on appeal, in an attempt to deflect

from its patent's written description problems, Takeda has conceded that "it is undisputed that a person of ordinary skill in the art could create a salt of an amorphous compound of dexlansoprazole (which must be solid under the Court's claim construction) based on the disclosure in Barberich." (Red Bf. 27.) That disposes of Takeda's ability to argue nonenablement of Barberich. Furthermore, the prior art taught three ways to make the solid amorphous solid dexlansoprazole disclosed by Barberich. Takeda myopically focuses its comments on the alleged difficulty in literally following the procedure in the Larsson reference. However, any procedure available in the prior art is sufficient. *E.g., Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1381 (Fed. Cir. 2003). Moreover, the law embraces adaptations within the skill in the art. *E.g., In re Lamberti*, 545 F.2d 747, 750 n.2 (CCPA 1976).[28]

124.    The court's Final Judgments in each case prevented TWi from obtaining approval of its ANDA until the expiration of the '282 Patent on June 15, 2020.  Impax and Par, also delayed by the '282 Patent, were further prevented from obtaining approval until December 20, 2020 (for Impax, after the expiration of the '058, '276, and '971 Patents; and for Par, after the expiration of the '276 Patent), subject to further patent term extensions for those patents under review at the Patent Office.

125.    The upshot of these rulings was, that, absent being overturned on appeal, the earliest TWi could come to market was after the expiration date of the '282 Patent on June 15, 2020, and Par and Impax were blocked until at least as July 30, 2023. TWi effectively leapfrogged Par and Impax in its ability to come to market, as they had now lost their first filer status with their losses at trial.

126.    Takeda recognized TWi's position of advantage compared to other generics due to the trial rulings, stating in a post-trial press statement: "[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020".

**D.  Takeda Resolves Each of Its Dexilant Patent Cases After the Initial Trial**

127.    Following the trial rulings, Par, TWi, and Impax all appealed the adverse aspects of the district court's decision to the Court of Appeals for the Federal Circuit. Takeda also cross-

---

[28] TWi Pharm., Inc.'s Response and Reply Brief, *Takeda Pharm. Co. Ltd., et al. v. TWi Pharma., Inc.*, Appeal Nos. 14-1074, 14-1129 (Fed. Cir. Nov. 24, 2014).

appealed the district court's determination that neither of Par, TWi nor Impax infringed the '755 patent.

128.    TWi presented a strong appeal challenging the validity of the '282 patent, which was the only patent the district court found TWi had infringed.

129.    At oral argument before the Court of Appeals for the Federal Circuit on March 6, 2015, TWi's arguments about anticipation or obviousness found favor with the appellate panel. One of the judges raised the issue of whether Judge Spero's failure to consider the evidence on this topic was "clearly erroneous" and inconsistent with the evidence.

130.    Conversely, Takeda presented a weak appeal challenging the district court's determination that none of the defendants infringed the '755 patent. The claim language is unambiguous, and Takeda itself initially advocated for the claim construction adopted and applied by the district court.

131.    All parties settled before the Court of Appeals for the Federal Circuit issued a ruling.

132.    Takeda settled with Par on or around July 18, 2014, and with Impax on or around October 16, 2014.

133.    Takeda's settlement with TWi took longer. But approximately seven weeks after oral argument before the Court of Appeals for the Federal Circuit, Takeda, recognizing that its arguments regarding the '282 Patent were being questioned skeptically by the judges, settled with TWi on or around April 27, 2015.

134.    By the end of 2015, Takeda had settled its ongoing infringement actions against all generic manufacturers whom it had sued with respect to ANDAs for Dexilant.

### E. Takeda's Settlement with TWi Included an Unlawful "Reverse Payment" Agreement, Whereby TWi Delayed Its Market Entry in Exchange for Significant and Unjustified Compensation from Takeda

135.    Takeda's agreement with TWi to resolve their ongoing patent disputes regarding Dexilant was a "reverse payment" agreement in violation of the antitrust laws.

136.    At the time of settlement in 2015, the only serious obstacle to entry that TWi faced was the '282 patent, which was set to expire on June 15, 2020.

137.    TWi had very strong arguments for a reversal of the trial court's ruling with respect to the '282 patent based on invalidity because prior art anticipated or rendered obvious the asserted claims in the patent. More specifically, TWi presented strong arguments that the district court had misconstrued the claim term "amorphous compound" by limiting it to solids and that, as properly construed, the claims were anticipated by prior art. TWi also presented strong arguments that even under the district court's claim construction, the claims were invalid for lack of written description and/or because the claims were anticipated or would have been obvious by prior art.

138.    Despite its strong appellate position, and the patent's June 15, 2020, expiration date, TWi agreed to delay entry of its generic Dexilant product until January 2022—approximately 18 months after the expiration of the '282 patent.

139.    TWi agreed this delay because Takeda agreed to provide large and unjustified payments to TWi in return.

140.    First, Takeda paid TWi $9.5 million as part of the agreement.

141.    TWi expressly acknowledged receipt of the payment in an annual financial report stating:

> On April 27, 2015, the Company and Takeda Pharmaceutical Company Limited and its American Subsidiaries (individually and collectively "Takeda") entered into a settlement agreement with regards to pending patent litigations. **In accordance with the terms of the agreement, Takeda paid the Company US$9,500 thousand**.")" (emphasis added).

142.    This payment far exceeded any reasonable estimate of Takeda's future litigation expenses. By the time of the payment, the core claims had already been tried before the district court and fully briefed and argued to the appellate court. Moreover, while Takeda had filed a separate case against TWi regarding two other patents, at the time of the settlement, the issues in that later filed case had been considerably narrowed through an order resolving cross motions for summary judgment.

CLASS ACTION COMPLAINT

CASE NO. 3:25-cv-2966

64.     On top of the $9.5 million payment, Takeda paid TWi by effectively granting TWi a monopoly on sales of generic Dexilant—the economic equivalent of a no-AG agreement.

143.     Under the terms of the Agreement, Takeda gave TWi the option of launching an AG version of Dexilant rather than launching its own ANDA product (assuming FDA approval).

144.     Given a choice between launching an AG and launching its own ANDA product, a generic manufacturer will almost always find it more profitable to launch the AG and forgo launching the ANDA product, particularly if entry by other ANDA filers is unlikely for some significant period of time.  If the generic chooses to launch its ANDA product, the brand company will normally find it profitable to launch an AG in order to capture some portion of the sales that would otherwise go to the ANDA filer, splitting those sales and lowering generic prices.  The generic manufacturer will almost always earn higher profits if there is a generic monopoly rather than a duopoly, even if it is required by the terms of the agreement to share those monopoly profits with the branded company.

145.     Takeda has a long history of launching AG products through one or more third parties and likely would have done the same with generic Dexilant had it not given TWi the option to launch the Dexilant AG.

65.     By giving TWi the option to launch an AG for Takeda, it effectively gave TWi the option to be the exclusive seller of generic Dexilant for a period of time.  This promise was extremely valuable to TWi and induced TWi to accept a later entry date.

146.     TWi's press release shortly after the settlement summarizes its AG rights in part as follows:

> As part of the settlement, the parties also entered into a License and Supply Agreement allowing TWi and its affiliates to sell Dexilant® in both dosage strengths as *the* Authorized Generic. (emphasis added)

> ***

> Furthermore, the license and supply of the Authorized Generic from Takeda allows TWi to be ***the supplier of both strengths of a generic Dexilant® in the U.S. market for a period, which provides significant sales and marketing advantage*** as well as furthering

TWi's goal of bringing affordable healthcare to patients. (emphasis added)

147. Consistent with the parties' agreement that TWi's AG rights would be exclusive, TWi describes them using definite term "the" rather than indefinite terms such as "a" or "an" which would be the appropriate word choice for a non-exclusive arrangement.

148. TWi's references to an agreed period of time where it would have a "significant sales and marketing advantage" is also important. If Takeda retained the right to launch an AG in competition with the AG launched by TWi, there would be no need for the agreement to contain a set time period and no "significant sales and marketing advantage" during such time period.

66. As promised to Takeda, TWi did not enter the market on June 15, 2020, when the '282 patent expired. Instead, TWi waited until on or around January 1, 2022, to launch as an AG product pursuant to its license from Takeda.

149. Takeda has never launched an AG Dexilant product to compete with TWi.

150. In fact, as previewed by TWi in its 2015 press release just after the Agreement was inked, the AG product TWi sold in 2022 was the sole generic on the market for nearly a year, until November 22, 2022.

151. Due to their unlawful Agreement, both Takeda and TWi benefitted by avoiding fair and legal competition.

152. Takeda benefited because, rather than face competition from a generic Dexilant product, Takeda enjoyed a complete monopoly until January 2022.

153. This unlawful extension of Takeda's monopoly allowed Takeda to continue profitably charging supracompetitive prices to purchasers much longer than would have otherwise been possible.

154. Sales of the AG product sold by TWi were more than $328 million in 2022 alone. Had Takeda launched an AG to compete with TWi's ANDA product, the AG would have captured a large share of those sales.

155.    Indeed, an FTC Study from 2011 found that AGs reduce a first-filer generic's revenues by about 50% on average during the first six months.

156.    By giving TWi the option to launch the AG rather than Takeda, Takeda effectively gave up at least a portion of the sales it would have made by launching an AG—a large transfer of value from Takeda to TWi.

157.    While TWi lost time on the market by waiting until January 2022, the lack of competition TWi enjoyed when it did enter as the sole generic, along with the $9.5 million payment from Takeda, more than compensated TWi for the delay.

## F.    Takeda Entered Into Other Alleged Improper Agreements with Competitors During this Same Time Period

158.    Takeda had a practice of engaging in suspect agreements with competitors during this period of time.

159.    Approximately seven months prior to the Defendants' Agreement concerning Dexilant, Takeda entered into an agreement with generic competitor Par concerning a different Takeda drug called Amitiza ("Amitiza Agreement").

160.    Similar to Defendants' Agreement here, the Amitiza Agreement is alleged to have been designed to prevent competition. Specifically, Par agreed to delay the launch of its generic Amitiza product in exchange for an implicit no-AG commitment from Takeda.

161.    Several antitrust lawsuits have been filed, and the court overseeing the case denied a motion to dismiss by Takeda, holding that the complaints in that case plausibly stated a claim of an antitrust violation.

162.    A little over a year after the Amitiza Agreement, and within a year of Defendants' Agreement here, Takeda entered into more agreements with competitors, this time concerning Takeda's drug Colcrys ("Colcrys Agreement").

163.    According to the plaintiffs in yet another antitrust case against Takeda, Takeda agreed with generic competitors to allocate the market for Colcrys.

164.    In particular, under the Colcrys Agreement, generic competitors allegedly agreed to delay their market entry in exchange for defined periods of exclusivity at a later date.

165.    The plaintiffs in the Colcrys matter defeated a motion to dismiss and summary judgment, and Takeda ultimately settled at trial before a verdict was rendered.

### G. If Takeda Retained the Right to Launch an AG or Received Royalties from TWi, such Facts Would Not Change the Illegality of Defendants' Agreement

166.    The terms of Defendants' Agreement were not publicly disclosed.

167.    However, Takeda and other pharmaceutical companies have in the past, for example as alleged in Amitiza, entered into similar reverse payment agreements with competitors that, to avoid scrutiny, purportedly reserve rights to launch AGs and/or require royalties from the generic competitor when it eventually comes to market after the delay.

168.    Insofar as Defendants' Agreement here contained such terms, this would not change the illegality of Defendants' conduct.

169.    With regard to No-AG agreements, courts, including in the Amitiza lawsuit against Takeda, have held that such agreements need not be explicit: "implicit no-AG agreement[s]" are also unlawful.[29]

170.    The payment of royalties by the generic does not change the analysis. Takeda argued in Amitiza that there can be no reverse payment if a generic is paying royalties. This argument was not only rejected, the court further held that Takeda's royalty structure with the generic in that case itself plausibly alleged a reverse payment.[30]

171.    Accordingly, even if Takeda purported to reserve some ability to launch another AG in Defendants' written agreement, it is clear from the facts—including, *inter alia,* Takeda's failure to ever exercise any such right and TWi's statements suggesting it had exclusivity—that such a reservation was pretextual.

---

[29] *Picone v. Shire PLC*, 2017 WL 4873506, at *9 (D. Mass. Oct. 20, 2017). See also *In re Amitiza Antitrust Litig.,* 2022 WL 17968695, at *4 (D. Mass. Dec. 27, 2022) (denying motion to dismiss antitrust claims against Takeda premised in part on an implicit agreement not to launch an AG).

[30] *In re Amitiza Antitrust Litig*., 2022 WL 17968695, at *4 (D. Mass. Dec. 27, 2022).

CLASS ACTION COMPLAINT                                                    CASE NO. 3:25-cv-2966

172.    Further, even if TWi made some royalty payments to Takeda, they would not negate the *reverse* payment from Takeda to TWi.

173.    If anything, as Takeda has done in the past, the royalty amounts and/or structure were likely set up to reinforce Takeda's commitment to not launching an AG. For example, a declining royalty structure whereby Takeda would receive less if it launched an AG to compete with TWi would financially disincentivize Takeda from launching an AG and would in no way cleanse the Defendants' Agreement of its anticompetitive effects.

**H. In the Absence of Defendants' Agreement, Two Generics Would Have Been Available, at a Much Lower Price Point, by Approximately June 15, 2020 or Earlier**

174.    In the absence of Defendants' unlawful Agreement, at least two generics would have been available no later than June 15, 2020, when the '282 patent expired, instead of merely branded Dexilant.

175.    Specifically, absent the unlawful Agreement, TWi would have launched its ANDA product under its own ANDA on or about June 15, 2020. In turn, Takeda would have sold an AG to compete with TWi's product to capture some of the generic market.

176.    *First*, TWi's ANDA would have been approved on or before its entry date in 2020. TWi's ANDA was ultimately approved in September 2022, but approval would not have taken that long if not for Defendants' unlawful Agreement. FDA has a practice of focusing its limited resources on approval of products whose launches are imminent. TWi's agreement to delay its launch, coupled with its ability to come to market as an AG under Takeda's NDA, disincentivized TWi from aggressively seeking earlier approval and eliminated the need for FDA to act on TWi's application sooner.

177.    *Second*, there were no first filer exclusivities standing in the way of TWi. The exclusivity of the first filers—Par on the 60 mg product and Impax on the 30 mg product—were forfeited due to their delays in getting their products tentatively approved and/or the findings of non-infringement at trial as to TWi on patents that were blocking the first filers.

178.  *Third*, Takeda's patents would not have delayed TWi's entry date. Takeda stipulated that several of its patents, specifically, the '058, '276, '971 and '668 patents, would not be infringed by TWi, and TWi prevailed on all but the '282 patent, which expired in June 2020, at the trial. While Takeda sued TWi on two other patents—the '187 and '158 patent—in a separate lawsuit, had the parties not settled, TWi would have prevailed. Among other reasons, these patents were plainly invalid due to prior art. Takeda's remaining patents purportedly covering Dexilant would have been easy for TWi to either design around or carve out or been subject to noninfringement or invalidity defenses similar to those TWi advanced against the '187 and '158 patents. Indeed, Takeda itself recognized, before its unlawful Agreement with TWi, that generic entry was likely in June of 2020, stating: "[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020".

## IX.  CLASS ALLEGATIONS

179.  Plaintiff brings this action as a class action under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of itself and as a representative of a class defined as follows:

> All persons and entities in the United States and its territories that directly purchased Dexilant and/or generic Dexilant in any form, from the Defendants or their affiliates from June 15, 2020, until the effects of Defendants' conduct cease.

180.  Excluded from the class are Takeda, TWi, and any of their officers, directors, management, employees, parents, subsidiaries, and affiliates.

181.  Also excluded from the class are the government of the United States and all agencies thereof, and all state and local governments and all agencies thereof.

182.  Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiff believes the class is numerous and widely dispersed throughout the United States. Given the costs of complex antitrust litigation, it would be

uneconomic for Plaintiff to bring an individual claim or join them together with other purchasers. The class is readily identifiable from information and records in Defendants' possession.

183.    Plaintiff's claims are typical of the claims of the members of the class. Plaintiff and all members of the direct purchaser class were damaged by the same wrongful conduct of Defendants—*i.e.,* as a result of Defendants' conduct, they paid artificially inflated prices for Dexilant or generic Dexilant.

184.    Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the class.

185.    Counsel representing Plaintiff are experienced in the prosecution of antitrust class action litigation and have particular experience with antitrust class action litigations involving pharmaceutical products.

186.    Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members, because Defendants have acted on grounds generally applicable to the entire class.

187.    Questions of law and fact common to the class include:

  a.    Whether Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive generic suppression scheme;

  b.    Whether there exist any legitimate procompetitive reasons for some or all of Defendants' conduct;

  c.    To the extent such justifications exist, whether there were less restrictive means of achieving them;

  d.    Whether direct proof of Defendants' monopoly power is available and, if so, whether it is sufficient to prove Defendants' monopoly power without the need to define the relevant market;

  e.    Whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

  f.    Whether Defendants' unlawful Agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the class;

  g.    Whether Defendants conspired to delay generic competition for Dexilant;

h. Whether Defendants' Agreement was an unlawful reverse payment agreement;

i. Whether, pursuant to Defendants' Agreement, Takeda's effective promise not to compete against TWi's generic product constituted a payment;

j. Whether Takeda's Agreement with TWi was necessary to yield some cognizable, non-pretextual procompetitive benefit;

k. Whether Takeda's compensation to TWi was large and unexplained;

l. Whether the reverse payment harmed competition;

m. Whether the agreement between Takeda and TWi alternatively constituted an agreement to allocate markets that is a *per se* violation of the Sherman Act.

n. Whether, prior to January of 2022, Takeda possessed the ability to control prices and/or exclude competition for Dexilant;

o. Whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Dexilant or in causing some amount of delay in the market entry of multiple competing AB-rated generic Dexilant products;

p. Determination of a reasonable estimate of the amount of delay the Defendants' unlawful monopolistic conduct caused;

q. The quantum of overcharges paid by the class in the aggregate; and.

r. Whether Plaintiff and the proposed Class are entitled to injunctive relief in order to prevent Defendants' ongoing unlawful conduct.

188. Class action treatment is the superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

189. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

X.  MARKET POWER AND RELEVANT MARKET

190.    The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Dexilant, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's doctor chooses which product the patient will buy, while the patient (and in most cases his or her insurer) has the obligation to pay for the product.

191.    Brand manufacturers, including Takeda, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

192.    The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the cross-price elasticity of demand—the extent to which rising prices of a product cause unit sales to decline because of substitution to other products. This reduced cross-price elasticity, in turn, gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Dexilant.

193.    Before January 1, 2022, Takeda had monopoly power in the market for Dexilant because it had the power to maintain the price of dexlansoprazole at supra-competitive levels without losing enough sales to make supra-competitive prices unprofitable. From January 1, 2022,

through November 22, 2022, Takeda and TWi combined had substantial market power in the market for Dexilant and its generic equivalent.

194.    Before January 1, 2022, a small but significant, non-transitory increase to the price of brand Dexilant would not have caused a significant loss of sales. From January 1, 2022, through November 22, 2022, a small but significant, non-transitory increase in the price of generic Dexilant would not have caused a significant loss of sales.

195.    Brand Dexilant does not exhibit significant, positive cross-elasticity of demand with respect to price with any other drug other than AB-rated generic versions of Dexilant.

196.    Brand Dexilant is differentiated from all other drugs other than the AB-rated generic versions of Dexilant.

197.    Takeda (and, later, Takeda and TWi) needed to control only brand Dexilant and its AB-rated generic equivalents, and no other products, in order to maintain the price of dexlansoprazole profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions of Dexilant would render the Defendants unable to profitably maintain their prices for Dexilant and generic Dexilant without losing substantial sales.

198.    For several years, Takeda sold brand Dexilant at prices well in excess of marginal costs and in excess of the competitive price, and therefore, Takeda had extraordinarily high profit margins.

199.    From January 1, 2022, through at least November 2022 and likely beyond, TWi sold AG Dexilant at prices well in excess of marginal cost and in excess of the competitive price, and therefore, TWi had high profit margins.

200.    Takeda had, and exercised, the power to exclude generic competition to brand Dexilant.

201.    Takeda and TWi had and exercised the power to exclude generic competition to the TWi-marketed AG.

202.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected brand Dexilant from the forces of price competition.

203.     There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Defendants' ability to control the price of brand Dexilant and generic Dexilant, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence consists of, inter alia, the following facts: (a) generic Dexilant would have entered the market at a much earlier date, at a substantial discount to brand Dexilant, but for the Defendants' anticompetitive conduct; (b) Takeda's gross margin on Dexilant (including the costs of marketing and its share of Takeda's ongoing research/development costs) at all relevant times was very high; and (c) Takeda never lowered the price of Dexilant to the competitive level in response to the pricing of other brand or generic drugs.

204.     To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust market is the market for Dexilant and its AB-rated generic equivalents.

205.     The United States and its territories constitute the relevant geographic market.

206.     Takeda's market share in the relevant market was 100% until January 1, 2022, after which Takeda and TWi, collectively, had 100% market share in the relevant market until November 22, 2022, when generic seller Par launched a 60 mg generic Dexilant product.

## XI. MARKET EFFECTS AND DAMAGES TO THE CLASS

207.     Takeda and TWi willfully and unlawfully maintained Takeda's market power— and the corresponding ability to charge monopoly prices—by entering into a reverse payment agreement that delayed the entry of generic Dexilant.  In particular, Takeda paid TWi $9.5 million in cash and effectively granted TWi an 11-month monopoly over the sale of generic Dexilant in return for TWi's agreement to delay generic entry.

208.     Takeda and TWi unlawfully maintained Takeda's market power by engaging in an overarching scheme to exclude competition. Defendants designed a scheme to delay entry of generic competitors, to further Takeda's anticompetitive purpose of forestalling generic competition against Dexilant, in which TWi cooperated in order to increase its own profits.

1  Defendants carried out the scheme with the anticompetitive effect of maintaining supra-
2  competitive prices for the relevant products.

3       209.    Defendants implemented the scheme as described herein. These acts, in
4  combination and individually, were undertaken to serve Defendants' anticompetitive goals.

5       210.    Defendants' acts and practices had the purpose and effect of restraining competition
6  unreasonably and injuring competition by protecting brand Dexilant, and later the TWi-marketed
7  AG Dexilant, from competition. These actions allowed Defendants to maintain a monopoly and
8  exclude competition in the market for brand Dexilant and its generic equivalent to the detriment
9  of Plaintiff and all other members of the direct purchaser class.

10      211.    Defendants' exclusionary conduct delayed generic competition and unlawfully
11 enabled Takeda to sell brand Dexilant without generic competition, and then for TWi to sell AG
12 Dexilant without generic competition. Were it not for Defendants' illegal conduct, one or more
13 generic versions of Dexilant would have entered the market sooner and TWi would have faced
14 competition when it eventually came to market with its generic product.

15      212.    As a consequence, Plaintiff and other members of the class sustained substantial
16 losses and damage to their business and property in the form of overcharges, the exact amount of
17 which will be the subject of proof at trial.

18           **XII. ANTITRUST IMPACT AND EFFECT ON INTERSTATE COMMERCE**

19      213.    During the relevant time period, Defendants manufactured, sold, and shipped
20 Dexilant and generic Dexilant across state lines in an uninterrupted flow of interstate commerce.

21      214.    During the relevant time period, Plaintiff and members of the class purchased
22 substantial amounts of Dexilant and AG Dexilant directly from Defendants. As a result of
23 Defendants' illegal conduct, Plaintiff and the members of the class were compelled to pay, and did
24 pay, artificially inflated prices for Dexilant and AG Dexilant.

25      215.    During the relevant time period, Defendants used various devices to effectuate the
26 illegal acts alleged herein, including the United States mail, interstate and foreign travel, and/or

27

interstate and foreign wire commerce. All the Defendants engaged in illegal activities, as charged herein, within the flow of, and substantially affecting, interstate commerce.

216.    Defendants' conduct was within the flow of, and was intended to have and did have a substantial effect on, interstate commerce in the United States and its territories, including in this District.

217.    During the class period, each Defendant, or one or more of each Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme. The scheme in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and its territories.

## XIII.    CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT

218.    A cause of action accrued for Plaintiff and class members each time the Defendants sold a brand or generic Dexilant product to at a supra-competitive price made possible by their anticompetitive conduct. And each sale by Defendants of a product at a supra-competitive price constituted another overt act in furtherance of their anticompetitive scheme. Accordingly, Plaintiff is entitled to recover all damages on all sales that Defendants made to Plaintiff and class members at supra-competitive prices within four years of the filing of this lawsuit.

219.    Due to Defendants' fraudulent concealment of their unlawful conduct, however, Plaintiff and members of the class are entitled to recover damages reaching back beyond four years of the filing of this complaint.

220.    Defendants' scheme was self-concealing, and Defendants also employed deceptive tactics and techniques to avoid detection of, and to affirmatively conceal, their contract, combination, conspiracy and scheme. For example, TWi's press release regarding the settlement made no mention of the $9.5 million payment it received from Takeda and did not disclose any information regarding Takeda's agreement not to launch a competing AG. Defendants affirmatively chose not to publicly disclose critical and material details of their Agreement to keep hidden the Agreement's many anticompetitive features.

221.    It was not until TWi actually launched its AG product in January 2022 that the nature and terms of Defendants' Agreement was revealed.

222.    Plaintiff had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme and conspiracy through the exercise of due diligence more than four years before the filing of this complaint.

223.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and class members' claims have been tolled.

### XIV.   CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF 15 U.S.C. §§ 1 AND 3
### (AGAINST TAKEDA AND TWI)

224.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

225.    Takeda and TWi violated 15 U.S.C. §§ 1 and 3 of  the Sherman Act by entering into an agreement in unreasonable restraint of trade in executing and adhering to the Agreement containing an unlawful reverse payment by Takeda, consisting of a payment of $9.5 million to TWi and a commitment not to launch its own authorized generic Dexilant product to compete with TWi's generic version of Dexilant, in exchange for TWi's agreement to delay the launch of its generic version of Dexilant.

226.    Plaintiff and other members of the class have been injured in their business or property by the violation of 15 U.S.C. §§ 1 and 3. Their injury consists of having paid higher prices for brand and generic Dexilant purchased from Defendants than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the Defendants' conduct unlawful. Plaintiff, as a direct purchaser from TWi, is the proper entity to bring a case concerning this conduct.

227.    From the launch of brand Dexilant in 2009, Takeda possessed monopoly power in the relevant market—*i.e.*, the market for sales of dexlansoprazole in the United States. But for the

Defendants' wrongful conduct, as alleged herein, Takeda would have lost its monopoly power in the relevant market well before it did on or around January 1, 2022.

228.    On or about April 24, 2015, Takeda and TWi entered into a reverse payment agreement, a continuing illegal contract, combination, and restraint of trade under which Takeda paid TWi substantial consideration in exchange for TWi's agreement to delay bringing its generic version of Dexilant to the market, the purpose and effect of which were to: (a) delay generic entry of Dexilant in order to lengthen the period in which Takeda's brand Dexilant could monopolize the market and make supra-competitive profits; and (b) ensure that, when TWi was permitted to enter the market, there would not be competition between a TWi generic and other generics for nearly a year, thereby allowing TWi to monopolize the generic market for Dexilant during that period, and allowing TWi to make supra-competitive profits.

229.    Defendants' Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

230.    Takeda and TWi are liable for their anticompetitive agreement under a "rule of reason" standard under the antitrust laws.

231.    There is and was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on direct purchasers and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose.

232.    As a direct and proximate result of Takeda and TWi's anticompetitive conduct, including the reverse payment, Plaintiff and members of the class have been injured and continue to be injured by this conduct, which is ongoing and seek treble damages for past harms.

233.    Given that Defendants' conduct is ongoing and will continue to cause irreparable injury to Plaintiff and members of the Class, they also seek to enjoin Defendants' unlawful conduct pursuant to 15 U.S.C. §26.

## COUNT TWO – VIOLATION OF 15 U.S.C. §§ 1 AND 3
### (AGAINST TAKEDA AND TWI)

234.    Plaintiff hereby repeats and incorporates by reference paragraphs 1 through 233 as though fully set forth herein.

235.    Takeda and TWi were potential competitors and violated 15 U.S.C. §§ 1 and 3 by entering into an agreement to allocate markets once the '282 Patent expired in June of 2020.

236.    Plaintiff and other members of the class have been injured in their business or property by the violation of 15 U.S.C. §§ 1 and 3. Their injury consists of having paid higher prices for brand and generic Dexilant purchased from Defendants than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the Defendants' conduct unlawful. Plaintiff, as a direct purchaser from TWi and assignee of McKesson Corporation—which purchased brand and generic Dexilant directly from Defendants for resale to KPH—is the proper entity to bring a case concerning this conduct.

237.    Defendants' Agreement constitutes a market allocation agreement. This is a *per se* violation of Section 1 and 3 of the Sherman Act.

238.    Plaintiff and members of the class have been injured and continue to be injured by this conduct, which is ongoing and seek treble damages for past harms and injunctive relief going forward.

239.    From the launch of brand Dexilant in 2009, Takeda possessed monopoly power in the relevant market—*i.e.*, the market for sales of dexlansoprazole in the United States. But for Defendants' wrongful conduct, as alleged herein, Takeda would have lost its monopoly power in the relevant market well before it did on or around January 1, 2022.

240.    On or about April 24, 2015, Takeda and TWi entered into an illegal market allocation agreement under which Takeda paid TWi substantial consideration in exchange for TWi's agreement to delay bringing its generic version of Dexilant to the market, the purpose and effect of which were to: (a) delay generic entry of Dexilant in order to lengthen the period in which Takeda's brand Dexilant could monopolize the market and make supra-competitive profits; and

(b) ensure that, when TWi was permitted to enter the market, there would not be competition between a TWi generic and other generics for nearly a year, thereby allowing TWi to monopolize the generic market for Dexilant during that period, and allowing TWi to make supra-competitive profits.

241.    Given that Defendants' conduct is ongoing and will continue to cause irreparable injury to Plaintiff and members of the Class, they also seek to enjoin Defendants' unlawful conduct pursuant to 15 U.S.C. §26.

### COUNT THREE – VIOLATION OF 15 U.S.C. § 2 FOR MONOPOLIZATION (AGAINST TAKEDA)

242.    Plaintiff hereby repeats and incorporates by reference paragraphs 1 through 231 as though fully set forth herein.

243.    Prior to 2022, Takeda possessed monopoly power in the market for dexlansoprazole.

244.    Takeda engaged in an exclusionary conduct scheme that involved a payment of $9.5 million to TWi and commitment not to launch its own authorized generic Dexilant product to compete with TWi's generic version of Dexilant in exchange for TWi's agreement to delay its market entry until 2022.

245.    The goal, purpose, and/or effect of Takeda's scheme was to maintain and extend its monopoly power with respect to Dexilant. Takeda's illegal scheme to delay the introduction of generic Dexilant allowed it to continue charging supra-competitive prices for the drug without a substantial loss of sales.

246.    During the relevant period, Plaintiff and the class purchased substantial amounts of Dexilant directly from Takeda. As a result of Takeda's illegal conduct, Plaintiff and the members of the class were compelled to pay, and did pay, inflated prices for Dexilant.

247.    Plaintiff and all class members paid prices for Dexilant that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because

1    Plaintiff and class members were deprived of the opportunity to purchase lower-priced generic

2    Dexilant instead of the more expensive brand Dexilant.

3        248.    The anticompetitive consequences of Takeda's actions far outweigh any arguable

4    procompetitive benefits. Takeda acquired and extended a monopoly through unlawful means.

5        249.    Takeda's scheme was, in the aggregate, an act of monopolization undertaken with

6    the specific intent to monopolize the market for Dexilant and generic Dexilant in the United States,

7    in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

8        250.    Plaintiff and members of the class have been injured and continue to be injured by

9    this conduct and seek treble damages for past harms.

10        251.    Given that Defendants' conduct is ongoing and will continue to cause irreparable

11    injury to Plaintiff and members of the Class, they also seek to enjoin Defendants' future unlawful

12    conduct pursuant to 15 U.S.C. §26.

13                        **XV. DEMAND FOR JUDGMENT**

14        WHEREFORE, Plaintiff, on behalf of itself and the proposed class, respectfully demands

15    that this Court:

16        A.    Determine that this action may be maintained as a class action pursuant to Rules

17    23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice

18    of this action, as provided by Rule 23(c)(2), be given to the class, and declare Plaintiff as

19    representatives of the class;

20        B.    Enter joint and several judgments against Defendants and in favor of Plaintiff and

21    the proposed Class;

22        C.    Enjoin Defendants from engaging in the unlawful ongoing conduct described

23    herein;

24        D.    Award the class damages (*i.e.*, three times overcharges after statutory trebling) in

25    an amount to be determined at trial;

26        E.    Award Plaintiff and the class their costs of suit, including reasonable attorneys' fees

27    as provided by law; and

1    F.    Award such further and additional relief as the case may require and the Court may

2  deem just and proper under the circumstances.

3                                    **XVI.   JURY DEMAND**

4        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself

5  and the proposed class, demands a trial by jury on all issues so triable.

6

7  Dated:  March 31, 2025

8                                    Respectfully submitted,

9                                    */s/ Michael P. Lehmann*

10                                   Michael P. Lehmann
                                     (State Bar No. 77152)

11                                   **HAUSFELD LLP**
                                     580 California Street, 12th Floor

12                                   San Francisco, CA 94104
                                     Telephone: (415) 633-1908

13                                   mlehmann@hausfeld.com

14                                   Michael D. Hausfeld (*pro hac vice forthcoming*)

15                                   **HAUSFELD LLP**
                                     1200 17th Street, N.W., Suite 600

16                                   Washington, DC 20036
                                     Tel: (202) 540-7200

17                                   Fax: (202) 540-7201
                                     E-mail: mhausfeld@hausfeld.com

18

19                                   Michael L. Roberts (*pro hac vice forthcoming*)
                                     Erich P. Schork (*pro hac vice forthcoming*)

20                                   Christopher Sanchez (*pro hac vice forthcoming*)
                                     Stephanie Egner Smith (*pro hac vice forthcoming*)

21                                   **ROBERTS LAW FIRM US, PC**
                                     1920 McKinney Ave., Suite 700

22                                   Dallas, TX 75201
                                     Telephone: (501) 821-5575

23                                   mikeroberts@robertslawfirm.us
                                     erichschork@robertslawfirm.us

24                                   chrissanchez@robertslawfirm.us
                                     stephaniesmith@robertslawfirm.us

25

26

27

1

2

*Counsel for Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. and the Proposed Direct Purchaser Class*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CLASS ACTION COMPLAINT                                    CASE NO. 3:25-cv-2966